# CHARLESTON.

### ZANHIZER *et al. v.* HEFNER *et al.*

Submitted September 14, 1899,—Decided January 24, 1900.

1. CONVEYANCE—*Chattel Mortgage—Record.*

A conveyance of goods and chattels, absolute on its face, but in reality made to secure a debt, is in equity a mortgage, and, to be good as to creditors, must be recorded. (p. 421.)

2. INJUNCTION—*Sale—Chattels—Damages.*

An injunction will not lie against the sale of goods and chattels attached, claimed by a third party, unless they are of peculiar value to the owner, and it is clearly shown and manifestly appears that great injury would result to the owner from consequential damages from the sale, because the owner has complete and adequate remedy at law (p. 419.)

3. ATTACHMENTS—*Multiplicity—Suits—Parties.*

The fact that attachments by four distinct creditors are levied on goods of a common debtor, they having no connection, will not give a third party, claiming the goods, an injunction on the ground of preventing multiplicity of suits. (p. 420.)

Appeal from Circuit Court, Braxton County.

Bill by Zanhizer Bros. & Sten against J. B. Hefner and others. Decree for plaintiffs, and defendants appeal.

*Reversed.*

DULIN & HALL, for appellants.

JOHN B. MORRISON, for appellees.

BRANNON, JUDGE:

Hefner, Tully, Rudkin, and Carney each brought an action before a justice of Braxton County for the recovery of debts against Sam and George Holmes, called "Holmes Bros.," and sued out attachments against the estate of the defendants as nonresidents, and levied the same on some tools and material used for boring oil wells, and judgments having been rendered for the plaintiffs in the four actions, and orders of sale having been issued to sell the property,

Zanhizer Bros. & Sten filed a bill in chancery, claiming the property as theirs, and not liable for the debts aforesaid, and obtained an injunction against its sale. The defendants demurred and answered. The result was a decree overruling a demurrer and motion to dissolve the injunction, perpetuating the injunction, and an appeal by the defendants.

The position of the defendants is that equity has no jurisdiction, becuse of adequate remedy at law, and that the property belongs to Holmes Bros. That property was personal property. If Zanhizer Bros. & Sten were its owners, they had adequate remedy at law. They could sue to reclaim it by detinue against the officer or purchaser, or sue the attachment creditors or theofficer in trespass and recover its value. By Code 1891, chapter 50, sections 151, 152, 210, they could present their claim to the justice, and have their right tried, with appeal to the circuit court, and, if they sustained their claim, they would get the very property itself. By giving bond, they could use the property pending the contest, and without bond they could have the right of property tried. It would be no more burdensome to give that bond than an injunction bond. This remedy is very speedy, plain, and efficacious. As Judge Green said in *Baker* v. *Rinehard*, 11 W. Va. 238, this statutory remedy would forbid an appeal to equity. As held in that case, many decisions in Virginia binding on us hold, as did that case, that equity cannot enjoin the sale under execution of personal property claimed by a third party, when the property is not, from its nature, of peculiar value to its owner, and its sale will not greatly injure the owner by the consequential damage it would produce. That case expresses doubt whether the fact that consequential damage would alone give equity jurisdiction, thus making it rest on pecularity in the character of the property. This doctrine is repeated in *White* v. *Stender*, 24 W. Va. 615. It is a firm rule, under many decisions, in the Virginias. It is hard to allow equity jurisdiction, under their decisions, in such cases. It must be very plainly shown, under the particular circumstances, that the property is of very peculiar character, and that the consequential damage would entail irreparable injury. I incline to admit that, if a party

were actually engaged in boring an oil well, and the tools being used were levied on as the property of another, and great consequential damage would result from sale, equity would intervene. The bill charges irreparable injury to ensue from the sale, the answer denies it, and there is no proof of it. They were not boring a well. It had been bored without result, and abandoned. Tools for oil wells are easily bought. They possess no peculiar quality in themselves.

Jurisdiction cannot be rested on the theory of prevention of multiplicity of suits. The fact that four creditors sue their debtor on separate debts cannot give jurisdiction. There is no complication in such case, though there may be some inconvenience; but it is not anything more than inconvenience of several trials, not inadequacy of the legal remedy. "Injunction for prevention of multiplicity of suits is allowed only when the subject-matter of the various litigations as well as the parties, are substantially the same. And the fact that different suits have been brought, each having a distinct object, founded on distinct and separate grounds, brought by different persons, does not constitute such a multiplicity of suits to bring the case within the rule and warrant an injunction." *Haines* v. *Carpenter*, 91 U. S. 254, 23 L. Ed. 345; High, Inj. § 65. In that case Justice Bradley said that three suits were not enough to give chancery jurisdiction. In this case all are interested only in the question of title, not at all otherwise; and Pom. Eq. Jur. § 268, says that, to give jurisdiction to prevent multiplicity of suits, there must be a common right, and "it is not enough that, the claims of each individual being separate and distinct, there is a community of interest merely in the question of law or fact involved, or in the kind or form of remedy demanded." In this case these creditors are all interested in the mere question of the right of property, but they have no common right, no connection with each other, and the judgment in one of their suits has no legal effect upon another. They are interested only in a question, not in result, as having the force of adjudication.

But what if there were jurisdiction in equity? The claim of the plaintiffs fails on the merits. They do not

own the property.   They have a deed for it absolute on its
face, but made to secure a debt.   The deed was not re-
corded.   Though a conveyance of goods and chattels need
not be recorded, yet, if it is in fact to secure a debt, though
absolute on its face, it is void unless recorded; and this
deed is void as to these attaching creditors.   *Poling* v.
*Flanagan*, 41 W. Va. 191, (23 S. E. 685.)   Zanhizer Bros.
& Sten were manufacturers of oil-well tools in Pennsyl-
vania.   They admit that they sold these tools to Holmes
Bros., in that state, and that Holmes Bros., as contractors
for the boring of an oil well for Zanhizer Bros. & Sten, in
that state, did use these tools in boring a well there.   This
is a strong circumstance to show the probability that the
deed subsequently made for these tools by Holmes Bros.
to Zanhizer Bros. & Sten was in fact only to secure a con-
tinuing debt.   Zanhizer Bros. & Sten claim that this debt
was never paid, except by the retransfer of the tools.
When Zanhizer Bros. & Sten determined to bore for oil in
Braxton County, and contracted with Holmes Bros. to bore
for them with these tools, that deed was made in Pennsyl-
vania, probably only to better secure the debt, as the tools
were to go into another state.   I say this looks plausible.
It is fully proven that the universal rule in the oil business
is that where a well is bored by contractors, the contrac-
tors furnish the tools.   After the execution of that deed,
when the parties were embarking in the oil business in
Braxton County, these tools were shipped to that county,
to be used by Holmes Bros. in boring a well at Burnsville
for Zanhizer Bros.   The tools were consigned to the name
of Holmes Bros.   The engine, boiler, and casing belonged
and were consigned to Zanhizer Bros. & Sten.   Why were
not the tools consigned to them also, if they owned the
tools under that deed?   The evidence is that the party
owning the well furnishes casing, engine, and boiler, the
contractor the tools.   When Zanhizer Bros. & Sten were
asked to pay for hauling the tools from the station to the
well site, they refused, saying they owned and would pay
for hauling casing, boiler, and engine, but Holmes Bros.
must pay for hauling the tools.   V. O. Zanhizer, one of the
firm, wrote a letter to Hefner, who presented the bill for
haulage directing Hefner to make out separate bills,—

one against Zanhizer Bros. & Sten for hauling boiler, engine, and casing, and a separate bill against Holmes Bros. for hauling the tools. Zanhizer, as a witness admitted that it was usual for the contractor to pay for hauling tools only when he owned them. If their firm owned them, why should Holmes Bros. pay for hauling their tools? A. J. Zanhizer, of the firm, as a witness, was asked whether the deed from Holmes Bros. to Zanhizer Bros. & Sten for the tools was not given to secure the firm the debt for their purchase money, and he answered pointedly, "It was." What more evidence could be asked? But there is much more. A. J. Zanhizer told J. B. Hefner that he had a purchase-money lien on the tools. This was after the attachments. At another time he told M. W. Hefner that he had such lien on the tools. V. O. Zanhizer made an important statement to Knight after the well had been finished. Knight said to him, that, if they did not wish to drill another well, he would find a man to buy the material, and bore another well; whereupon Zanhizer said that, if Holmes Bros., would still carry their interest, they would drill another well. Why say that Holmes Bros. had an interest, if they did not own the tools? But, in fact, this is not merely a fair inference from what Zanhizer said; for he went on to say that Zanhizer Bros. & Sten owned boiler, engine, and casing, and Holmes Bros. the tools. He also said, as to the well which had been bored, that Holmes Bros. were to furnish the tools and bore the well for one thousand two hundred dollars, and an eighth interest, and he wanted to give them work, because they owed Zanhizer Bros. & Sten. Owed for what? No other debt is shown but that for the tools. He said, further, that if they did not again bore. they would sell the boiler, engine, and casing cheap. He was asked, as a witness, if he had this conversation, and answered: "I might have had a conversation of that kind, but do not remember what I said. I did not tell him we owned the boiler, engine, and casing simply, and did not tell him we owned the tools simply." He said he was only in fun. When he returned after the dinner recess to the stand, he was asked what he meant by saying, before dinner, that he was in fun, and replied: "I meant that, if I did offer to sell Knight any machinery and tools,

it was only by way of joke, as Knight was not in the business or able to buy." Knight did not represent Zanhizer as offering to sell the tools, as Knight said that Zanhizer stated that they belonged to Holmes Bros. Knight did not represent that he himself would purchase, but that he would find a man able to buy. This seems to me to be equivocation or unfrankness on Zanhizer's part. He admitted that the tools had been shipped to Holmes Bros. from Pennsylvania after that deed, and the boiler, engine, and casing to Zanhizer Bros. & Sten, though he says that he told Holmes Bros. to ship them in the name of Zanhizer Bros. & Sten. If so, and the goods belonged to Zanhizer Bros. & Sten, it is not probable that they would have been shipped to the name of Holmes Bros. This is not all. V. O. Zanhizer told the two Hefners, on different occasions, that his firm owned boiler, engine, and casing, and Holmes Bros. the tools. Further, A. J. Zanhizer distinctly told Rudkin that the tools belonged to Holmes Bros. This volume of evidence, as well as the circumstances of the transaction,—all its features,—all show clearly that Holmes Bros. owned the tools, and that their transfer of them to Zanhizer Bros. & Sten was only a mortgage to secure a debt, if that debt still exists. *Shank* v. *Groff*, 43 W. Va. 337, (27 S. E. 340). Holmes Bros. at one time owed Zanhizer Bros. & Sten a debt. Holmes Bros. did a large amount of work, which we would suppose paid that debt. We have no evidence from Holmes Bros. as to this. Their evidence is not in the case. Where did their work go, if not to pay this debt? Is it probable that two wells would be bored, and the debt remain unpaid? If their late claim as to that deed being an absolute sale were true, why did they not take the depositions of the Holmeses? Why did they not record the deed? But, if a debt is yet unpaid, it is not material, as the deed is void as to these just creditors. If Zanhizer Bros. & Sten lose anything, who but themselves is to blame? · They brought Holmes Bros. from abroad, shipped the tools to their name, refused to pay haulage for them, saying and writing that Holmes Bros. should pay haulage of the tools, and themselves that of boiler, etc , and holding out to the people that Holmes Bros. owned the tools, and letting Holmes Bros. represent

to the people that they owned the tools; and Zanhizer Bros. & Sten keeping that deed hidden in their pocket, until the people had extended credit to these strangers on the faith, inspired by these many circumstances, that Holmes Bros. owned the tools. How could these creditors form any other conclusion? Zanhizer Bros. & Sten are to blame, and innocent creditors ought not to suffer for their fault. In fact, the mere conduct of Zanhizer Bros. & Sten, even if their ownership were absolute, is perhaps enough alone to work an estoppel in equity against their claiming to the prejudice of creditors, aside from other points above given, controling the case in favor of the creditors.

I have not considered as entering into the case the many declarations of Holmes Bros. to people that they owned the tools, because, generally, declarations of a grantor, made subsequently to his conveyance, derogating from the rights of his grantee, are not admissible. *Caslo* v. *Fry*, 33 W. Va. 449, (10 S. E. 799); *Crothers' Adm'r* v. *Crothers*, 40 W. Va. 169, (20 S. E. 927). Some question might be made whether that exclusion is applicable in this case, under the rule that declarations of a party in possession, explanatory thereof, are competent. *High's Heirs* v. *Pancake*, 42 W. Va. 602, (26 S. E. 536). But I do not consider such declarations of Holmes Bros. competent for all the purposes of the case, yet I do consider them competent for the purpose of showing that the Zanhizers being in that neighborhood, so that they likely would hear of such declarations, yet alowed them to go undisputed, and themselves made declarations confirmatory thereof. In other words, the declarations of Holmes Bros. are competent only as a circumstance, with others, to establish an estoppel from conduct against Zanhizer Bros. & Sten in favor of the creditors. Decree reversed, and bill dismissed.

*Reversed.*